IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

SHAMEL HOWELL, Individually and     :
by and through Conservators,        :
BIRDIE and RICHARD POGUE,           :
                                    :
     Plaintiffs,                    :
                                    :
v.                                  :          No. 5:09-CV-402 (CAR)
                                    :
HOUSTON COUNTY, GEORGIA,            :
CULLEN TALTON, Individually and in  :
His Official Capacity as Sheriff of :
Houston County, Georgia, HOUSTON    :
COUNTY SHERIFF=S OFFICE,            :
CHARLES HOLT, W.H. RAPE, MATT       :
THOMAS CHAMBERS, CHERYL             :
KINNEY JONES, ERIC LEON BAKER,      :
ELTON LAW, JAMES PAUL TAYLOR,       :
SHANNON PERRY, THERESA              :
JEAN REYNOLDS, JAMES KEITH          :
BLAIR, GREGORY GRAHAM,              :
TYRONE JOHNSON, and                 :
ANTONIO KADRELL ASKEW,              :
all individually and in their official :
capacities,                         :
                                    :
     Defendants.                    :
_____

**ORDER ON DEFENDANTS=MOTIONS FOR SUMMARY JUDGMENT**

This case concerns the treatment of Plaintiff Shamel Howell (AHowell@) at the hands of various

officers at the Houston County Detention Center on the night of January 7, 2008.  Howell contends

that the officers violated his rights under the Fourth, Eighth, and Fourteenth Amendments by using

excessive force against him.  He also raises comparable claims under state law.

This matter comes before the Court on the Motion for Summary Judgment filed by Defendants Matt Chambers, Cheryl Jones, Eric Baker, and Elton Law [Doc. 76], and the Motion for Summary Judgment filed by Defendants Antonio Askew, James Blair, Gregory Graham, Charles Holt, Jamario Johnson, Shannon King, W.H. Rape, Theresa Reynolds, Cullen Talton, James Taylor, Houston County Sheriff=s Office, and Houston County, Georgia [Doc. 77].  Defendants argue they are entitled to summary judgment on a number of grounds, including: qualified immunity for individual capacity claims under federal law, Eleventh Amendment immunity for official capacity claims under federal law, qualified immunity for individual capacity claims under state law, and sovereign immunity for official capacity claims under state law.

For the reasons set forth below, the Motion for Summary Judgment filed by Defendants Askew, Blair, Graham, Holt, Johnson, King, Rape, Reynolds, Talton, Taylor, Houston County Sheriff=s Office, and Houston County [Doc. 77] is **GRANTED**, and the Motion for Summary Judgment filed by Defendants Chambers, Jones, Baker, and Law [Doc. 76] is **GRANTED-IN-PART** and **DENIED-IN-PART**.

## I. BACKGROUND

A.      Chain of Command in the Houston County Sheriff=s Office

Defendant Henry Cullen Talton Jr. (ASheriff Talton@) is the Sheriff of Houston County.  He has served as Sheriff since January 1, 1973.  Sheriff Talton occupies the highest point in the chain of command in the Houston County Sheriff=s Office.  Although Sheriff Talton retains ultimate responsibility regarding the Office=s policies and procedures, he delegates much of that responsibility to Chief Deputy William Rape and Major Charles R. Holt Jr.

Defendant William Rape (AChief Deputy Rape@) has served with the Houston County Sheriff=s

Office since 1973.  At various times, he held the position of Investigator, Chief Investigator, and Major to the Chief Administrative Officer, before ascending to the position of Chief Deputy in May 2006.  As Chief Deputy, he reports directly to Sheriff Talton.

Defendant Charles Holt Jr. ("Major Holt") has also served with the Houston County Sheriff's Office since 1973.  He reached his current position as Major Jail Administrator in 2003.  In that capacity, he is responsible for the supervision and operation of the Houston County Detention Center ("Detention Center").  That responsibility includes, among other things, making sure that officers receive training on standard operating procedures and detention policies and procedures.

Defendant Cheryl Kinney Jones ("Lieutenant Jones") has served with the Sheriff's Office for twelve years.  At the time of the incident in question, Lieutenant Jones reported to Major Holt as a shift commander at the Detention Center.  In that capacity, she was responsible for the day-to-day operations for the shift, including assigning officers to their posts and supervising deputies, corporals, and sergeants.  As a shift commander, Lieutenant Jones had an intake sergeant and a housing sergeant report directly to her during her shifts.  Jones was elevated from the position of sergeant to lieutenant roughly ten to eleven months before the incident.  When she was promoted, she received on-the-job training from other lieutenants.  Prior to the incident, she had never been disciplined.

On the night of the incident, Defendant Shannon Louise King-Perry ("Sergeant King") was the sergeant in charge of intake rotation at the Detention Center.  In that capacity, she reported directly to Lieutenant Jones.  Defendant Theresa Reynolds ("Sergeant Reynolds") was the sergeant in charge of the housing rotation.  She also reported directly to Lieutenant Jones.  Sergeant King and Sergeant Reynolds each had a corporal serving directly under them.  Defendant Eric Baker ("Corporal Baker") was the housing corporal and reported to Sergeant Reynolds.  Defendant James Blair ("Corporal

Blair@ was the intake corporal that night and reported directly to Sergeant King.

The remaining defendants, Defendants Antonio Askew (AAskew@, Matthew Chambers (AChambers@, Gregory Graham (AGraham@, Jamario Tyrone Johnson (AJohnson@, Elton Law (ALaw@, and James Paul Taylor (ATaylor@ all served as deputies reporting to either Corporal Baker or Corporal Blair.  John Lovejoy (ALovejoy@ also served as a deputy at the Detention Center.

B.    Prior Incidents Involving Howell

Prior to the night of this incident, Plaintiff Howell had visited the Detention Center several times.  Although several officers characterized Howell as a generally quiet guy that complied with orders, several other officers testified to instances where Howell refused to comply with orders and caused disturbances.  Chief Deputy Rape characterized Howell as having been problematic during earlier stays.  On one occasion, Corporal Baker was called in to assist when Howell refused to strip down.  Another time, Deputy Graham and Corporal Baker had to remove Howell from a pod because he became disruptive when placed with either a white or Mexican inmate.  In another incident, Howell shoved an officer into his cell and attempted to lock the officer inside.  Sergeant Reynolds recalled one prior incident with Howell when Howell had been fighting with another inmate in a pod and refused to comply with an officer=s commands.  During that incident, Howell was Amad, cussing, wanting to fight.@ The officers eventually got into a physical struggle with Howell and had to place him in handcuffs and belly chains in order to force Howell to comply with orders.  Deputy Chambers testified that officers had run-ins with Howell because Howell was unwilling to let officers come into his cell and perform cell searches.  Deputy Taylor testified there were several instances where Howell refused to turn over his belongings during cell shakedowns.  Deputies Chambers, Johnson, and Graham all testified that Howell would often refuse to comply with a white officer=s order and would

4

get in a white officer=s face.

C.    The Incident

Warner Robins Police arrested Howell at approximately 10:46 p.m. on January 6, 2008, for violating O.C.G.A. ▪ 16-13-30(j), Possession of Marijuana with Intent to Distribute.  He was taken to the Houston County Detention Center, and at around 12:35 a.m. on January 7, 2008, Corporal Blair prepared Howell=s Arrest/Booking Report.

Detention Center policy requires an incoming individual to take a shower, turn in his clothes, and put on a prisoner jumpsuit.  There is some dispute as to the proper nomenclature for the overall procedure that showering and turning over your clothes falls into.  Howell claims that there is evidence that showering and turning over your clothes is part of the booking process.  The various officers= testimony is almost unanimous, however, that the Detention Center defines the booking process as entering the individual=s identifying information and charge into the computer.  The booking process is, in turn, part of the overall in-take process.  The in-take process includes, among other things, booking, photographing, fingerprinting, property inventory, showering, turning over your clothes, and changing into a prison jumpsuit.  For instance, Deputy Taylor, who was serving as the property officer on the night of the incident, stated that after an individual was booked in, photographed, and fingerprinted, he would be taken to the shower area where he would turn over his clothes, shower, and then put on a prison jumpsuit. [Doc. 38 at 12-14].  Major Holt characterized the shower and clothing exchange as occurring after the booking process as part of the overall in-take process. [Doc. 35 at 11-12].  On the other hand, Chief Deputy Rape appeared to describe the entire process that other officers called the in-take process as the booking process. [Doc. 39 at 25-27].  In any event, the evidence is clear an individual goes through a multi-step process upon entering the

5

Detention Center that includes having his information entered into the computer, having his fingerprints and photograph taken, turning over his personal property for inventory, showering, turning over his clothes, and changing into a prison jumpsuit. Whether this overall process is properly called the in-take process or the booking process is a matter of semantics.

On the night in question, Howell had progressed through the in-take process up to the point of showering without incident. Howell took off his clothes, laid them in a pile, and got into the shower. While Howell was showering, Deputy Taylor, in his role as the property officer, went through Howell's clothing. When Howell exited the shower, he picked up his gym shorts that he had previously taken off. Detention Center policy allows inmates to wear only white underwear. Howell's gym shorts, however, were colored and had a drawstring. Accordingly, he was not permitted to wear them under the policy. Deputy Taylor informed Howell that he could not wear his shorts, but Howell refused to give them back to Taylor. Deputy Taylor again requested that Howell give back his shorts, but Howell replied, "Fuck you, I'm not giving you the shorts. I'll kick your ass." Howell then put his shorts back on and put on his prison jumpsuit over his shorts. Deputy Taylor again asked Howell to remove his shorts and warned him that he was going to have to notify the sergeant because Howell was not allowed to wear the shorts. Deputy Taylor then walked Howell out of the locker room and down into an area known as the pit or intake area.

Deputy Taylor informed Sergeant King that Howell refused to give up his non-regulation shorts. Sergeant King asked Howell to remove his shorts, but he again refused. At that point, a radio

---

[1]     Howell disputes that he cursed at Deputy Taylor at this point, citing the deposition testimony of Deputy Law. Deputy Law's testimony, however, is clear that he was not yet present at the scene when this statement was allegedly made. Furthermore, Deputy Law testified that after he arrived, Howell was "talking, cursing, like normal inmates do." [Doc. 63 at 20-21].

call went out requesting multiple officers come to the intake area because there was a problem with an inmate.  In all, ten officers reported to the in-take area.

Defendants describe the next sequence of events as follows.  Several officers, including Lieutenant Jones, Sergeants King and Reynolds, Corporal Baker, and Deputies Johnson, Graham, and Taylor, attempted to speak to Howell individually and asked him to give up his shorts.  In response, Howell said that he wanted to fight, that he would jump on somebody, and that he was going to put "street stuff" on them.  Corporal Baker told Howell: "Man, I'm just going to be honest with you, man.  My supervisor's telling me that we're going to have to use force against you if you don't give up your shorts, you know."  Howell responded: "No disrespect towards you, G. Them crackers said they were going to tase me, so tell them to do what they've got to do."  Lieutenant Jones also spoke with Howell and reminded him that the Detention Center policy required him to remove his shorts.  Sergeant Reynolds approached Howell and asked him how he was doing.  He replied: "Fuck you."  Sergeant Reynolds then asked Howell to go into the shower and remove his shorts.  He responded: "Fuck you, I'm not giving up the shorts.  I don't give a fuck what you mother fuckers do, bring the Taser on.  I don't give a fuck, I'm going to kick your asses."  Graham and Johnson also attempted to speak to Howell.  Howell continued cussing and saying things like, "I ain't going down without a fight" and "No, you've got to do what you've got to do."  Throughout these interactions, Howell refused to remove his shorts and told the officers they would have to remove his shorts from him if they wanted them.

Having failed to get Howell to give up his shorts, the officers regrouped to consider how to proceed.  The officers planned to form a circle around Howell in the pit with multiple officers in a show of force.  The officers also decided that they would remove the chairs in the pit from around

Howell to prevent either Howell or the officers from being injured.  Sergeants King and Reynolds then retrieved tasers from central control and max control.  Lieutenant Jones instructed Sergeant King to take the lead.  During the discussion, one of the officers told Lieutenant Jones that during a previous stay at the Detention Center, Howell had slammed an officer=s head in the door and stuck his finger in Deputy Chambers=s chest.  One deputy told the group that Howell had threatened him and was cursing and saying he wanted to fight.  Lieutenant Jones testified that the plan was to tase Howell only if he approached the officers in an aggressive manner.

The officers then proceeded into the pit area.  At this point, the group entering the pit area was comprised of: Sergeant King, Sergeant Reynolds, Corporal Baker, Corporal Blair, Deputy Johnson, Deputy Chambers, Deputy Askew, Deputy Taylor, Deputy Law, and Deputy Graham.  They moved the chairs surrounding Howell out of the way both for his and their own safety.  While the officers were removing the chairs, Howell was talking to them, saying, ABring it on mother fuckers, bring it on, mother fuckers.  I=ve got something for you.@  Howell then stood up in what several officers perceived as a quick, aggressive manner.  He continued yelling and cussing at the officers, threatening that he would fight them.  Howell refused to sit down and told the officers, AFuck y=all.  I=m not giving it up.  Y=all going to have to take them away from me.@  During this time, Howell was moving around in the circle of officers with his hands by his sides.  He continued cursing and threatening the officers.

Sergeants King and Reynolds were stationed on opposite sides of Howell with tasers.  Sergeant King instructed Howell to remove his shorts several times.  Howell continued to talk over her commands and yell at the officers.  As the officers tried to talk to Howell, he paced back and forth, turning from Sergeant Reynolds to Sergeant King, and continued to curse the officers.  As he

moved back and forth in the circle of officers, he had his arms down by his side, gesturing with his hands, with his fists balled up at times.

At some point, Howell turned and took what several officers described as an aggressive step towards Sergeant Reynolds.  As he did so, he came within arm=s reach of her.  Sergeant Reynolds tased him.  Sergeant King, seeing that Howell had clenched his fists and taken a step towards Reynolds, also tased Howell.  Because they were stationed on opposite sides of Howell, Sergeant King did not see Sergeant Reynolds deploy her taser.  Sergeants King and Reynolds fired their tasers simultaneously.  After being hit, Howell fell to the ground.

After the five-second taser cycle ended, Howell drew his left knee forward.  The officers then grabbed Howell in an attempt to get his jumpsuit off.  According to several officers, Howell began resisting and struggling against the officers= attempts to remove his jumpsuit and shorts.  Deputies Graham and Johnson grabbed Howell=s legs, while other officers attempted to remove his jumpsuit.  At some point, Howell=s jumpsuit ripped.  After the jumpsuit ripped, the officers removed his shorts and stood him up.  They then escorted him to the rubber room.

Several officers testified as to the force used by other officers while Howell was on the floor.  Deputy Lovejoy, who observed the incident on a monitor at central control, saw Deputies Law and Chambers and Corporal Baker kick Howell two or three times each while he was struggling.  Deputy Chambers saw Corporal Baker put Howell in a head restraint during the struggle.  Sergeant Reynolds saw Deputies Law and Chambers kick at Howell, but could not tell if they made contact.  She also stated that she did not see either of them kick towards Howell=s upper torso.  According to Sergeant King, Howell was still being combative when someone kicked him.  None of the other officers testified as to having seen anyone hit, kick, stomp, or punch Howell.

Deputy Chambers admits to kicking Howell while he was on the floor in an attempt to get control because Howell was still struggling with the officers.  Deputy Chambers was standing by Howell's legs and believes he kicked Howell in the lower part of his waistline or his legs, not in his back.  Deputy Chambers also stated that he kicked Howell with the top of his foot and did not stomp on him.  Chambers admits to losing his cool, but contends that his actions were all taken in an attempt to get Howell under control because he was concerned that Howell might injure another officer.

Howell, unsurprisingly, disputes much of this account.  Those disputes, however, are raised in a somewhat unusual way.  Because of a mental illness, Howell is incapable of giving his own account of events via deposition or any other means.  Thus, the disputes he points to in the evidence are largely based on discrepancies in the various officers' depositions.

Howell's first major dispute deals with the period of time from when Deputy Taylor placed him in the pit after he put his jumpsuit on until the officers surrounded him in the pit just prior to the actual altercation. Defendants contend that during that time, several officers spoke to Howell, attempting to get him to remove his shorts, and that Howell continually refused to do so. [See generally SUMF && 71-87].  Howell disputes that any of that happened as described.  His basis for disputing those facts is that the videotape of the incident produced by the Houston County Detention Center does not show any officer speaking to Howell while he is sitting in the pit.

In that respect, Howell is correct.  The video begins with Howell sitting in the pit, and within the first fifteen to twenty seconds, all the officers enter the pit in a group and begin removing the chairs from around Howell.  Of course, Howell's contention that the absence of  any of the alleged prior events on the tape supports the inference that they did not happen only makes sense if the video shows the entirety of Howell's time in the pit after Deputy Taylor first placed him there.  There is no

indication that is the case.[2]  Instead, the video only shows the actual altercation and the immediately preceding events.  Thus, the absence of earlier events on a video that does not purport to show the entirety of the interactions between Howell and the officers does not contradict any officer≈s account of what happened prior to the beginning of the tape.  Accordingly, the Court accepts as undisputed the officers≈ otherwise undisputed account of what occurred from the time Deputy Taylor placed Howell in the pit until all the officers entered the pit to surround Howell.

Howell next disputes that the officers≈ plan was to convince him to comply without using force.  In support of that argument, he points to the deposition testimony of Corporal Baker.  Baker testified that as soon as he arrived at the pit, Sergeant King told him that he was going to get to tase Howell because he was certified on the taser.  Although that interaction took place when the officers first arrived at intake, which was before they discussed how to proceed after Howell refused several officers≈ request to remove his shorts, King≈s statement could support the inference that she had already decided that it would be necessary to use force to get Howell to comply and that the taser was the appropriate force.

In the same vein, Howell also disputes that the plan of actionCdeveloped by Lieutenant

---

[2]       In Paragraph 71 of the Statement of Undisputed Material Facts, Defendants state that when the officers arrived at intake, Howell was in the pit, still refusing to remove his shorts. As support for that fact, they cite to the video of the incident, specifically nine seconds into the video.  One might argue that because Defendants cite the beginning of the video as evidence that Howell was in the pit and refusing to remove his shorts when the officers first arrived, then the video must show the entirety of the time Howell was in the pit.  Multiple officers, however, testified in agreement that several officers spoke to Howell before the actual altercation, and no officer testified that no one spoke to Howell during that time.  The only reasonable way to reconcile the various officers≈testimony and the video is that Defendants somewhat inartfully cited the beginning of the video as evidence that Howell was refusing to remove his shorts, not because the beginning of the video corresponds to when Howell entered the pit, but because even after the other events and directly before the altercation, Howell was still sitting in the pit with his

Jones—was only to tase Howell if he approached the officers in an aggressive manner. Again, Howell cites to Corporal Baker—s statement to support his position. Baker also testified, however, that Lieutenant Jones instructed Sergeant Reynolds to tase Howell if he came at anyone in an aggressive manner. Thus, there is no dispute that Lieutenant Jones—s instruction was only to tase Howell if he came at anyone in an aggressive manner. Baker—s testimony regarding King—s statement to him does not contradict the officers—testimony regarding the plan of action.

Howell next disputes Defendants—characterization of his actions from the time the officers entered the pit until Sergeants King and Reynolds fired their tasers. According to Defendants—Statement of Facts, after the officers moved the chairs, Howell stood up in an aggressive manner and started cursing and threatening the officers that he would fight and that they would have to tase him. Howell, on the other hand, contends that Deputy Law testified that Howell was not hostile and did not threaten anyone. Deputy Law stated that when Howell stood up, he did not come at anyone aggressively and that he did not threaten anyone. Deputy Law also testified, however, that when Howell stood up, he was Atalking [and] cursing@and saying he was going to fight. Deputy Law further testified that Howell balled up his fists. Howell also contends that the video does not show him cursing at or threatening the officers. Of course, the video has no sound, so it cannot contradict the officers—statements in that regard. Taken in the light most favorable to Howell, the evidence shows that when the officers removed the chairs from around Howell, he stood up, balled his fists at some point, and was talking and cursing at the officers and saying he was going to fight.

Howell also takes issue with Defendants—account of the situation just before Sergeants King and Reynolds fired their tasers. According to Defendants, Howell was pacing back and forth between

shorts on, as evidenced by the first ten seconds of the video.

King and Reynolds, still refusing to take off his shorts and talking over King=s commands.  Howell then made an aggressive moves towards Reynolds, at which point Reynolds fired her taser.  King, seeing Howell turn with clenched fists toward Reynolds, also fired her taser.

Howell=s account is again different.  According to Howell, neither Sergeant Reynolds nor Sergeant King was communicating with him before they fired their tasers.  Howell also contends that neither sergeant announced she was about to fire her taser.  In his deposition, Corporal Baker stated that neither Sergeant Reynolds nor Sergeant King announced she was going to use her taser before firing it on Howell.  Also, in Howell=s view, the video does not show him moving back and forth between Sergeants King and Reynolds in an aggressive stance.  The video, however, clearly shows Howell moving around within the circle of officers.  Given the lack of sound and picture quality, the character of his movements is not so obvious from the video as to contradict various officers= statements that he was moving aggressively.  Howell also contends that he never made an aggressive move towards Sergeant Reynolds and never attempted to hit any officer.  As to the question of whether he attempted to hit anyone, there is no dispute.  Defendants=statement of facts says only that Howell=s body language when he turned toward Reynolds was as if he was going to hit or fight someone and that he was close enough to hit Reynolds if he tried when Reynolds tased him.  Defendants never state that he actually attempted to hit Sergeant Reynolds.  As to the aggressiveness of his movements, Corporal Baker stated that Howell never came at Reynolds in an aggressive manner.  That being the case, there is evidence indicating that at least one officer did not view Howell=s movements as aggressive.

In short, taken in the light most favorable to Howell, the evidence shows that, as described above, he was moving in the circle of officers, still cursing and refusing to remove his shorts, and that

he had his hands clenched into fists at times.  The video does not contradict any testimony to that effect; instead, it shows Howell pacing and turning about within the group and gesturing with arms down by his waist.  Although Corporal Baker did not view Howell's movement towards Reynolds as aggressive, Baker does not appear to dispute that Howell turned and moved towards Baker, and indeed the video shows Howell turn to face one of the sergeants with a taser just before Sergeants King and Reynolds fire their tasers.

Howell's next major point of contention concerns his actions after Sergeants King and Reynolds fired their tasers.  According to Defendants, after the taser cycle ended Howell started fighting and resisting as officers moved in to remove his jumpsuit.  He continued to verbally and physically refuse to comply, was still cursing and threatening, and constantly turning and resisting the officers.  Once the officers had removed Howell's shorts and stood him on his feet, he began calling for his mother and yelling that he would comply.  Howell's account is markedly different.  According to Howell, when Sergeants King and Reynolds fired their tasers, he lost control of his body, fell immediately to the ground, and laid there.  Once on the ground, he laid there, non-combative, calling for his mother.  In support of his characterization of the events, he points to the deposition testimony of Corporal Baker and Deputy Law.

To the extent that some officers testified that Howell was not just defensively resisting the officers' attempts to remove his jumpsuit, but also offensively fighting or struggling against the officers, the testimony of Baker and Law contradicts that account.  Corporal Baker stated that when the tasers first hit Howell, he went down and did not move initially.  After several seconds, Howell started moving and the officers moved in on him.  Corporal Baker also stated that after the officers moved in on Howell to try to get his jumpsuit off, he was turning his body.  Thus, Baker's testimony

14

supports the inference that Howell was only turning defensively in trying to prevent the officers from removing his suit.  Deputy Law=s testimony paints a similar, but more limited picture.  In response to Plaintiff=s counsel=s question of whether Howell was combative after he fell to the floor, Deputy Law stated: AHe just lay on the floor, just holler for his mama.@ Upon further questioning, however, Law stated that although he did not recall Howell fighting the officers while he was on the ground, Howell was shifting around on the ground.

Taken in the light most favorable to Howell, Baker and Law=s testimony would support the inference that after Howell was tased, he turned or shifted his body when the officers closed in on him to remove his jumpsuit and shorts, but he was not combative or attempting to offensively fight the officers. Thus, contrary to Howell=s assertion that he laid on the ground completely compliant after he was tased, the evidence shows that he exhibited at least a minimal level of resistance to the officers= attempts to remove his jumpsuit and shorts.

Howell generally agrees with the testimony of officers who saw Deputies Law and Chambers and Corporal Baker kick him while he was on the ground.  He disputes, based on Law=s testimony, any characterization that he was combative or struggling when the officers allegedly kicked him.  He also disputes Defendants= characterization that they escorted him to the rubber room, pointing to Corporal Baker=s testimony that the officers pushed him into the rubber room.

D.    Aftermath

After the officers placed Howell in the rubber room, Sergeant Reynolds removed the taser prongs from Howell=s body.  Soon after the officers placed Howell in the room, the nurse saw Howell and applied some ointment and bandages to him.  Several officers testified that Howell was not bleeding and that he did not have any bruises or scratches following the incident.  Defendants

15

concede, however, that Howell had cuts where the taser prongs punctured the skin and an abrasion on his upper torso.

Sergeants Reynolds took photographs of Howell directly after the incident pursuant to jail policy that required photographs when an inmate was tased.  One of these photos showed what appeared to be a shoe print on Howell=s back.  There is some debate over what happened to that photograph.  Lieutenant Jones testified that she determined that the photo showing the apparent shoe print was not needed because it did not show taser marks.  She gave the photograph to Chambers.  She conceded her decision was poor judgment, but explained that she had never been in an incident when an inmate had been kicked.  Deputy Chambers testified that he shredded the photo pursuant to jail procedure to shred any paperwork not needed for the file.  According to Sergeant King, however, Lieutenant Jones stated that the picture of Howell=s back was too condemning and told King she needed to shred it.  After King nonverbally refused to shred the photo and returned it to Jones, she saw Jones walk into the mail room and heard the shredder operating.

Whether that photograph was ultimately destroyed for good is unclear from the various officers= testimony.  In conjunction with their motions for summary judgment, Defendants submitted several photographs [Doc. 86].  The first page contains three pictures, one of which shows Howell=s back.  It appears this is a copy of the photo destroyed by Jones or Chambers.  The second page contains three photos.  One of those shows an abrasion on Howell=s right temple.  The other two show abrasions on his back, including some that appear to be shoe prints.  Although the testimony is again unclear, these pictures appear to have been taken the following day when Major Holt began to investigate the incident.  In any event, there are several photographs in the record that show an

abrasion on Howell's right temple[3] and several abrasions on his mid or upper back, some of which resemble a shoe print.

After the incident, Sergeant King completed an incident report charging Howell with violation of jail rules, including "disobeying an officer, failure to comply, and security operations." Lieutenant Jones also completed an incident report.  Sergeants King and Reynolds both prepared use of taser and use of force reports.

On the morning of January 8, 2008, Sergeant Reynolds called Major Holt to inform him of the incident.  Holt went to Reynolds's house, where he spoke with King and Reynolds.  After speaking with King and Reynolds, Holt contacted Chief Deputy Rape and informed him of the incident.  Holt then began an investigation into what had occurred.

As part of his investigation, Holt interviewed Lieutenant Jones, Sergeants King and Reynolds, and Deputies Askew, Law, Graham, Chambers, and Johnson.  Holt also viewed the videotape of the incident.  In an attempt to determine which officer might have stepped on or kicked Howell's back, Holt inspected the shoes of all of the officers involved in the incident.  He determined that none of them matched the imprint on Howell's back.   At the conclusion of his investigation, Holt recommended to Chief Deputy Rape that Lieutenant Jones, Corporal Baker, and Deputies Law and Chambers be terminated for various violations of the Detention Center's standard operating procedures and use of force policy.

After Holt gave his recommendation to Chief Deputy Rape, Deputy Chambers and Corporal Baker both resigned before they were terminated.  Deputy Law and Lieutenant Jones were both

---

[3]        Corporal Baker speculates that the abrasion on his face may have occurred when officers pushed Howell into the rubber room.

terminated.

      E.      <u>Prior Incidents Involving Officers</u>

      The record also contains evidence of two prior use of force incidents involving some of the defendants in this case.  Lieutenant Jones, Sergeant King, Corporal Baker, and Deputies Law, Johnson, and Askew were all present at a prior incident involving an inmate on a restraint bed.  The inmate became combative and spit on Deputy Johnson.  Deputy Johnson put his hand over the inmate=s mouth to prevent him from spitting.  When Johnson moved him hand, Deputy Law put his hand over the inmate=s mouth.  During the incident, Law hit the inmate with a closed fist three times. The inmate was not injured, and Law was not disciplined for the incident.

      Several officers were also involved in an incident with an inmate named Brandon Smith. Smith was causing a disruption by yelling and banging his handcuffs.  He ignored officers=commands to stop.  Officers went into Smith=s cell to readjust his handcuffs.  In doing so, they had to place Smith on the floor.  While he was on the floor, Smith began pulling away from the officers.  The officers attempted to place belly chains on Smith, but because he was resisting, they had to wrestle with him.  During that process, Corporal Baker kicked Smith in the head, and Deputy Chambers stepped on the back of his neck.  None of the officers hit Smith after he was restrained.  Chambers was not disciplined as a result of the incident.

      The record also contains some evidence of a group known as the AHardliners.@ Several times, Deputy Law referred to the members of his shift as the AHardliners.@ He took the name from a wrestling group from the 1980s.  Sergeant Reynolds heard Deputies Baker and Law use the term Hardliners as some time prior to the incident involving Howell.  Sergeant King also heard Deputies Chambers and Law use the term.  According to Major Holt, King spoke to him about the Hardliners

roughly three or four days before the Howell incident.  According to Holt, that was the first time he heard the term Hardliners.  At that time, King had no particular information other than she thought Deputies Law and Chambers were a part of the group.  Sheriff Talton never heard anything concerning the group.

      F.      <u>Procedural Background</u>

On November 19, 2009, Howell filed a Complaint alleging that Defendants violated is rights under the Eighth and Fourteenth Amendments by using excessive force against him.  The Complaint raised similar claims under state law.

On August 19, 2010, the Court permitted Howell to amend his Complaint to add claims under the Fourth Amendment.

On January 7, 2011, Defendants filed their Motions for Summary Judgment that are currently before the Court.

## II. LEGAL STANDARD

Motions for summary judgment in federal courts are governed by the Federal Rules of Civil Procedure.  Summary judgment must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986); <u>Johnson v. Clifton</u>, 74 F.3d 1087, 1090 (11th Cir. 1996).  Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247B48, 106 S. Ct. 2505 (1986).  This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.  <u>See</u> <u>id.</u>

at 249B52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence.  See id. at 254B55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097 (2000).  The moving party Aalways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact@and that entitle it to a judgment as a matter of law.  Celotex, 477 U.S. at 323 (internal quotation marks omitted).

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law.  See Celotex, 477 U.S. at 324-26.  This evidence must consist of more than mere conclusory allegations or legal conclusions.  See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).  Ultimately, summary judgment must be entered where Athe nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.@ Celotex, 477 U.S. at 323.

### III. DISCUSSION

Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. ▪ 1983.  The statute creates no protected rights, but instead provides a remedy for a violation of constitutional rights committed under color of state law.  There is no debate that Defendants were acting under color of state law during all the events pertinent to this case.  Thus, the issue under consideration is whether Defendants violated Plaintiffs constitutional rights.  Even assuming, however, that Defendants violated any of Plaintiffs constitutional rights, Defendants may still enjoy the protection of qualified immunity against claims brought against them in their individual capacity.  ▌Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct ➤does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.➤❷Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)).

Courts employ a two-part framework to evaluate qualified immunity claims.[4]  In order to deprive a defendant of qualified immunity, a plaintiff must demonstrate both that a constitutional violation occurred and that the constitutional right violated was clearly established.[5]  Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001).  The court may analyze those two questions in whatever order is most appropriate in the case before it.  Pearson v. Callahan, 555 U.S. 223, ___, 129 S. Ct.  808, 821 (2009).

---

[4]      There is an often overlooked requirement that precedes that two-part inquiry: whether Defendant was acting within the scope of his discretionary authority.  Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).  Here, it is clear that the officers were operating within the scope of their discretionary authority during the incident.

[5]      At the summary judgment phase, the Court answers these two questions taking the facts in the light most favorable to the plaintiff.

A.      Applicable Constitutional Standard

In assessing whether Defendants= alleged use of excessive force violated Howell=s constitutional rights, the Court must first determine which constitutional guarantee Defendants= actions allegedly infringed. Graham v. Connor, 490 U.S. 386, 394, 109 S. Ct. 1865, 1870 (1989) (AIn addressing an excessive force claim brought under ' 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.@). In his Complaint, Plaintiff alleged that Defendants= actions violated his Fourth, Eighth, and Fourteenth Amendment rights.[6] All three provide protection against excessive force at the hands of government actors, but the relationship between the plaintiff and law enforcement dictates the appropriate source for any given case.

The Eighth Amendment=s prohibition on cruel and unusual punishment protects individuals convicted of a criminal offense from the use of excessive force at the hands of government officials if that force is applied Amaliciously and sadistically for the very purpose of causing harm.@ Hudson v. McMillian, 503 U.S. 1, 5, 112 S. Ct. 995, 998 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 320B21, 106. S. Ct. 1078, 1085 (1986)).  The ban on cruel and unusual punishment, and its corresponding standard of conduct, Aapplies >only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.=@ Graham, 490 U.S. at 398, 109 S. Ct. at 1873 (quoting Ingraham v. Wright, 430 U.S. 651, 671 n.40, 97 S. Ct. 1401, 1412 n.40 (1977)). Because Howell had not yet been convicted when the incident in question occurred, the Eighth

_____

[6]      In his initial Complaint, Plaintiff alleged only violations of his Eighth and Fourteenth Amendment rights. [See Doc. 1].  The Court, however, later permitted Plaintiff to amend his Complaint to assert a claim under the Fourth Amendment as well. [See Docs. 49 & 50].

Amendment is not applicable to his claims.  Indeed, neither party, outside of Howell=s invocation of the Eighth Amendment in the Complaint, argues that it is the applicable standard.

The more difficult question is whether Howell=s excessive force claims implicate the Fourth Amendment=s protection against unreasonable seizures or the due process concerns of the Fourteenth Amendment.  In Graham, the Supreme Court took up the question of what constitutional standard governed the claim that a law enforcement official used excessive force in the course of making an arrest.   The Court held Athat all claims that law enforcement officers have used excessive forceCdeadly or notCin the course of an arrest, investigatory stop, or other >seizure= of a free citizen should be analyzed under the Fourth Amendment and its >reasonableness= standard, rather than under a >substantive due process= approach.@ Id. at 395, 109 S. Ct. at 1871.  The Court left open the question Awhether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins.@ Id. at 395 n.10, 109 S. Ct. at 1871 n.10.  The Court reiterated, however, Athat the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.@ Id. (citing Bell v. Wolfish, 441 U.S. 520, 535B39, 99 S. Ct. 1861, 1871B74 (1979)).

Graham=s open question has given rise to a variety of judicial authority as to what constitutional provision applies to excessive force claims lodged at various points in the criminal justice process.    A typical criminal case may involve a variety of interactions that may be of constitutional importance: an initial encounter with the police; an initial seizure by officers and any related pursuit or struggle; transport to a detention center; intake and booking into a detention center; the period of detention preceding an initial judicial appearance; and, in some cases, continued detention until trial.  Courts have struggled to determine where along that spectrumC particularly in

the post-arrest, pre-charge time period—an individual loses the protections of the Fourth Amendment and after which government action is only subject to the due process constraints of the Fourteenth Amendment.

Many cases will present a clear answer. If an officer allegedly uses excessive force in the process of arresting an individual, then the Fourth Amendment would clearly apply. On the other hand, if a jailer allegedly uses force on an individual who has been in custody for a substantial period of time after an initial judicial appearance awaiting trial, then the Fourteenth Amendment would clearly apply.

Unfortunately, this case is not so clear, and the Eleventh Circuit has not yet drawn a clear standard to govern the question. See Hicks v. Moore, 422 F.3d 1246, 1254 n.7 (11th Cir. 2005) ("The precise point at which a seizure ends (for purposes of Fourth Amendment coverage) and at which pretrial detention begins (governed until a conviction by the Fourteenth Amendment) is not settled in this Circuit."). In Hicks, the plaintiff "had already been arrested, delivered to the Jail, and had begun—but not completed—the booking process" when officers allegedly used excessive force against him. Id. Also, "[t]he original arresting officer had turned Plaintiff over to jailers, and he was not present during and did not participate in the events underlying the complaint." Id.

Of course, that is nearly a carbon copy of this situation. So it would seem that Hicks would be an excellent candidate from which to derive the outcome in this case, and indeed Howell suggests as much. But the promise of Hicks quickly fades away. The Eleventh Circuit applied the Fourth Amendment to the claim, but observed that it did so because "Defendants never argue[d] that the strip search or fingerprinting was separate from Plaintiff's seizure." Id. Thus, the court "assume[d] (for this case) Plaintiff was still being seized"and applied the Fourth Amendment. Id.

24

To the extent that <u>Hicks</u>, even if based on the defendant=s concession as to the proper standard, might argue for applying the Fourth Amendment here as well, other Eleventh Circuit cases with similar factual scenarios go the other way.  For instance, in <u>Fennell v. Gilstrap</u>, 559 F.3d 1212 (11th Cir. 2009), the court applied the Fourteenth Amendment to an excessive force claim based on a jailer=s use of force against the plaintiff during a struggle in the pat-down room soon after he arrived at the jail.  As with <u>Hicks</u>, the case would seem an apt comparison to this one because the struggle happened while the plaintiff was changing clothes during the in-take process.  <u>Id.</u> at 1214B1215.  But also as with <u>Hicks</u>, the court was not called on to engage in a close analysis of the applicable constitutional provision because the plaintiff conceded in his reply brief that his claim was governed by the Fourteenth and not the Fourth Amendment.  <u>Id.</u> at 1215 n.4.  The court observed that the plaintiff Acorrectly@ conceded that his claim was governed by the Fourteenth Amendment.  <u>Id.</u> (citing <u>Garrett v. Athens-Clarke County, Ga.</u>, 378 F.3d 1274, 1279 n.11 (11th Cir. 2004), for the proposition: AIf excessive force claim arises out of events occurring during an arrest, the Fourth Amendment governs.  If claim arises out of events occurring while plaintiff is a pretrial detainee, the Fourth Amendment governs.@  The court=s observation, however, is just thatCan observation.  Given the plaintiff=s concession, the court was not called on to decide the proper constitutional provision, and any statement in that regard was not necessary to its holding and thus dicta.  Of course, in deciding this case, the court=s observation is certainly due to be given proper consideration, but it is not, as Defendants would suggest, binding authority that clearly decides this case.

In addition to relying on <u>Fennell</u>, Defendants contend that the Eleventh Circuit=s decision in <u>Cottrell v. Caldwell</u>, 85 F.3d 1480 (11th Cir. 1996), clearly dictates the outcome in this case as well.  In that case, after the individual was placed under arrest, officers engaged in a twenty minute struggle

to subdue him.  Id. at 1488.  At the conclusion of the struggle, the officers placed hand and leg restraints on the individual, and then placed him in the police car in order to transport him to the police station.  Id.  The individual died of positional asphyxiation because of the position in which the officers had placed him in the car.  Id.  The decedent's estate then brought two claims against the officers: 1) a mistreatment in custody claim and 2) an excessive force claim.

In discussing the mistreatment in custody claim, the court observed that "[c]laims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause."  Id. at 1490.  Defendants argue that if a claim based on an individual dying from asphyxiation during the ride to the police station is covered by the Fourteenth Amendment, then *a fortiori*, a claim that arises after the individual is turned over to the jailers must also be subject to the Fourteenth Amendment.

Cottrell, however, raises as many questions as it answers—at least in regard to the proper constitutional provision for this excessive force claim.  In that case, the plaintiff raised two claims: a mistreatment in custody claim and an excessive force claim.  The court's statement quoted above: "Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause," id. at 1490, was made in the context of discussing the mistreatment in custody claim.  In analyzing that claim, the court treated it as a claim that officers exhibited deliberate indifference to the decedent's safety in the way in which they positioned him in the police car.  In its discussion, the court quote extensively from the Supreme Court's decision in Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994), a case focusing on the claim that jailers violated an inmate's Eighth

Amendment rights ignoring an allegedly substantial risk of harm that the inmate faced when he was placed in the general population of the jail.  The court=s description of the claim in <u>Cottrell</u> and its use of <u>Farmer</u> demonstrate that when it made the statement quoted above, it was speaking in the context of a conditions of confinement claim.  It may well be that the Eleventh Circuit considers a claim that an officer used excessive force against an individual already in custody as a type of conditions of confinement claim subject to Fourteenth Amendment analysis, but that conclusion is hardly explicit in the opinion.

Later panels of the Eleventh Circuit have quoted that statement from <u>Cottrell</u> in the context of excessive force cases, but never in the context of comparing factual situations to determine whether a claim of excessive force is covered by the Fourth or Fourteenth Amendment.  <u>See, e.g.</u>, <u>Hicks</u>, 422 F.3d at 1253 n.7.  Instead, as the Court has already lamented, the analysis is based on a concession as to whether the plaintiff was an arrestee or a pretrial detainee or whether the Fourth or Fourteenth Amendment applies.  <u>See</u> <u>Fennell</u>, 559 F.3d at 1215 n.4; <u>Hicks</u>, 422 F.3d at 1253 n.7.

To complicate matters further, in <u>Cottrell</u> the court then went on to address the plaintiff=s excessive force claim brought under the Fourth Amendment.  The court ultimately granted summary judgment in favor of the defendants on that claim, but it did so on the basis that the undisputed facts showed that the officers had not used excessive force, <u>Cottrell</u>, 85 F.3d at 1492, and not on the basis that the Fourth Amendment was not the applicable provision.  It is difficult to discern from the opinion whether the excessive force claim was only based on the officers= actions in the struggle that led to the decedent being placed in hand and leg restraints, or whether the claim was also based on the manner in which they placed him in the car once his arrest was complete and he was in custody.  The court=s statement that the Adistrict court=s detailed factfindings concerning the events surrounding the

arrest and the force applied make it clear that there is no genuine issue of material fact concerning excessive force in this case,@ id., casts light little on the subject.  The Aevents surrounding the arrest and the force applied@ could easily encompass the manner and position in which the decedent was placed in the car.  Of course, they might just as easily not.

In the end, Cottrell fails to answer the key questions in this case.  It is unhelpful in determining whether an individual has achieved the status of a pretrial detainee.  Even in the context of the conditions of confinement claim, the court only observed that arrestees and pretrial detainees in custody are subject to the Fourteenth Amendment, without making any decision as to which the decedent was.  And any meaningful conclusion that might be derived from the court=s application of the Fourteenth Amendment to the claim that was factually based on how the officers treated the decedent after the initial seizure is undermined by the fact that the court also applied the Fourth Amendment to the excessive force claims which might have also been based on the same conduct.  See Calhoun v. Thomas, 360 F. Supp. 2d 1264, 1273 (M.D. Ala. 2005) (suggesting that the court=s treatment of the Fourth Amendment claim implied that the Fourth Amendment provided the proper framework for post-arrest excessive force in that case).

Looking outside the Eleventh Circuit, circuit courts have taken a variety of approaches in determining whether an excessive force claim arises under the Fourth of Fourteenth Amendment.  The Fourth Circuit has held that the excessive force claims arising after arrest are governed by the Fourteenth and not the Fourth Amendment.  See Riley v. Dorton, 115 F.3d 1159, 1161B62 (4th Cir. 1997) (en banc) (excessive force claim based on arresting officer=s actions at police station while plaintiff was awaiting booking governed by Fourteenth Amendment), abrogated on other grounds by Wilkins v. Gaddy, 130 S. Ct. 1175 (2010).  In the Fifth Circuit, the AFourteenth Amendment begins to

protect persons "*after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been in detention awaiting trial for a significant period of time." Gutierrez v. City of San Antonio, 139 F.3d 441, 452 (5th Cir. 1998) (quoting Brothers v. Klevenhagen, 28 F.3d 452, 455-56 (5th Cir. 1994)).[7]  In Brothers, the court found the plaintiff to be a pretrial detainee protected by the Fourteenth Amendment because "he had been arrested, processed by the police department, and spent several hours in jail before the police allegedly used excessive force on him." Id.  In Gutierrz, however, the court applied the Fourth Amendment because the officers who allegedly used excessive force against the plaintiff were the same officers who initially seized him and because the incident happened near the point of the initial seizure, both in distance and time.  Id.

---

[7]      The Eleventh Circuit quoted this standard with apparent approval in Garrett v. Athens-Clarke Cnty., Ga., 378 F.3d 1274, 1279 n.11 (11th Cir. 2004).

Other circuits, however, have applied the Fourth Amendment to claims that arise after and individual is in custody following his arrest. See Wilson v. Spain, 209 F.3d 713, 714B16 (8th Cir. 2000) (applying Fourth Amendment to excessive force claim based on actions taken by arresting officer at jail); Pierce v. Multnomah County, Or., 76 F.3d 1032, 1043 (9th Cir. 1996) (holding Athe Fourth Amendment sets the applicable constitutional limitations on the treatment of an arrestee detained without a warrant up until the time such arrestee is released or found to be legally in custody based upon probable cause for arrest@; Frohmader v. Wayne, 958 F.2d 1024, 1026 (10th Cir. 1992) (A[C]laims of post-arrest excessive force by arrestees . . . who are detained without a warrant are governed by the >objective reasonableness= standard of the Fourth Amendment as set forth in Graham v. Connor . . . until they are brought before a judicial officer for a determination of probable cause to arrest.@; see also Powell v. Gardner, 891 F.2d 1039, 1044 (2d Cir. 1989) (AWe think the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer.@.[8]

Having briefly surveyed other circuits= law, the Court turns again to Fennell because it is the most recent and most applicable statement from the Eleventh Circuit on the question. Fennell, as many other Eleventh Circuit cases, was decided on one party=s concession as to the applicable

---

[8]      Although not necessary to the disposition of this case, the Court notes that the Fourth Circuit=s approach in Riley is arguably consistent, or at least not inconsistent, with the Ninth and Tenth Circuits= approach that the Fourth Amendment applies until there is a judicial determination of probable cause. In Riley, the plaintiff was arrested pursuant to a warrant. See 115 F.3d at 1161. The warrant already stood as a judicial determination as to probable cause at the time he was arrested. Thus, once his initial seizure and arrest were completed and he was in police custody, the Fourteenth Amendment became the applicable provision because there was already a probable cause determination.

standard, but unlike most other cases, in <u>Fennell</u> the question was at least contested for some period, and, more importantly, the Eleventh Circuit voiced an opinion as to the correctness of the party=s concession.  Although not strictly controlling, the court=s observation in <u>Fennell</u> is, at this time, the Eleventh Circuit=s most applicable statement on the subject.  Considering the approaches outlined above in light of <u>Fennell</u>, it is simply impossible to conclude that the approach in the Ninth and Tenth Circuit Cthat the Fourth Amendment applies until a judicial determination of probable causeCis consistent with <u>Fennell</u>=s observation that the plaintiff was to correct to concede that his claim was covered by the Fourteenth Amendment.  The incident in <u>Fennell</u> happened soon after the plaintiff arrived at the jail and before any judicial appearance.  Conceding that the Fourteenth Amendment applied to a claim under those circumstances would in no way be correct if the Fourth Amendment applies until a judicial determination of probable cause.  Likewise, to the extent that the Second and Eighth Circuit focus on whether the arresting officer was involved in the use of force, such a rule would also be difficult to square with the correctness of the concession in <u>Fennell</u> because, although he was not the defendant, the arresting officer was involved in the struggle in <u>Fennell</u>.  <u>Id.</u> at 1214B15.

The court=s observation in <u>Fennell</u> suggests that the applicable underlying rule would be at least as stringent as the Fifth Circuit=s standard from <u>Gutierrez</u>.[9]  Looking to the Fifth Circuit=s

---

[9]       In actuality, the facts of <u>Fennell</u> suggest an even more stringent standard.  A more stringent standard might also explain the result in <u>Cottrell</u>.  <u>Cottrell</u> might be interpreted as follows.  Any force used to seize the decedent and place him in restraints was covered by the Fourth Amendment excessive force claim.  Any claim based on mistreatment at the hands of the officers after the decedent had been seized and taken into custody was then a conditions of confinement claim covered by the Fourteenth Amendment.  Such a conditions of confinement might include any type of mistreatment in custody, including uses of excessive force.  Thus, the court=s statement that claims of mistreatment by arrestees and pretrial detainees in custody are

application of that standard in <u>Brothers</u> and <u>Gutierrez</u>, the Fourteenth Amendment would apply in this case.  Unlike <u>Gutierrez</u>, the use of force in this case occurred several hours after Howell was arrested, it occurred in a different location than his arrest, and it was not at the hands of an arresting officer.  Instead, as in <u>Brothers</u>, Howell had already been arrested, he had nearly completed the intake process, and he had spent several hours in jail.

Laying aside any search for an easily applicable rule or standard or even a murkier multi-factor test, a factual comparison between <u>Fennell</u> and this case also suggests that the Fourteenth Amendment is the applicable provision.  As discussed above, in <u>Fennell</u>, the plaintiff was still at least in the joint custody of the arresting officer, and the arresting officer was involved in the struggle giving rise to the excessive force claim.  Here, Howell had been turned over to the Detention Center, and the arresting officer was in no way involved.  Also, in <u>Fennell</u>, the struggle happened very early in the intake process.  After arriving at the prison, Fennell was taken to the pat-down room, where the altercation soon followed.  Here, Howell had nearly completed the process.  He had been booked into the computer, fingerprinted, photographed, and showered.  By all indications, if Howell had given up his shorts and put on his jumpsuit as directed, he would have then been assigned to a cell, and the process would have been complete.  Furthermore, the altercation in <u>Fennell</u> appears to have happened soon after his arrival at the prison, whereas Howell had been at the Detention Center for several hours.  All of those facts suggest that if Fennell was correct to concede that the Fourteenth

---

subject to the Fourteenth Amendment would cover claims that officers used excessive force after an individual was taken into custody.  That being the case, the plaintiff's concession in <u>Fennell</u> was doubtless correct.  Of course, if that reasoning is accurate, it certainly raises questions regarding the litigation strategy of defendants, like those in <u>Hicks</u>, who conceded the Fourth Amendment was the applicable provision in cases where it likely was not under that reasoning.
    In any event, the Court need not adopt such a rule to decide this case.

Amendment applied to his claim, then *a fortiori*, the Fourteenth Amendment applies to Howell=s claim as well.

In opposition to that line of reasoning, Howell cites another case from this district in which the court applied the Fourth Amendment to a claim he suggests is factually similar to his.  There are two problems with his argument.  First, that case is factually distinguishable.  Second, the case predates Fennell.

In Albritten v. Dougherty Cnty., Ga., the court applied the Fourth Amendment to the plaintiff=s excessive force claim for two reasons: A(1) . . . the undisputed facts . . . indicate[d] that plaintiff=s arrest had not ended at the time of defendants= alleged use of excessive force, and (2) . . . the Fourth Amendment applies to plaintiff=s excessive force claims even if plaintiff was in post-arrest, pre-charge custody at the time of the use of such force.@ 973 F. Supp. 1455, 1459B60 (M.D. Ga. 1997).  As to the first reason, the facts in this case are distinguishable in several important ways.  In Albritten, the court concluded that the use of force occurred in the course of Albritten=s arrest Abecause of (1) the proximity in time of defendants= use of force to Albritten=s initial arrest, (2) [the arresting officer=s] presence and apparent custody of Albritten at the time of the use of force, (3) the stated purpose of the use of force being to effect a secondary search incident to arrest, and (4) the apparent purpose of the incarceration as something other than pretrial detention.@ Id. at 1461.

The facts of this case are different on all four fronts.  Although the court did not state the precise amount of time that had passed before the use of force in Albritten, it described the use of force happening in a short sequence of events that began when Albritten arrived at the jail.  In this case, Howell had been present at the jail for several hours before the use of force.  Also, as already discussed, Howell had already been fully turned over to the custody of the Detention Center.  He was

no longer in the custody of the officer that arrested him, and that officer was no longer present when the use of force occurred.  Furthermore, the purpose of the use of force in this case was to enforce compliance with Detention Center policies, not to effect a secondary search incident to arrest.  Thus, the use of force here had a clearly detention-related, as opposed to arrest-related, purpose.  And finally, unlike <u>Albritten</u>, the apparent purpose of Howell=s incarceration was to hold him until his initial judicial appearance.  The Court expresses no opinion as to whether the court was correct to conclude in <u>Albritten</u> that under the facts of that case the use of force happened during Albritten=s arrest.  Likewise, the Court expresses no opinion as to whether, if presented with those facts, it would reach the same conclusion under a test similar to the <u>Gutierrez</u> test.  The Court only finds that the distinctions between this case and <u>Albritten</u> undermine any persuasive weight <u>Albritten</u> might carry on the question of whether the use of force happened during Howell=s arrest.

In addition to finding that the use of force happened during Albritten=s arrest, the court was also Apersuaded by the decisions of the Sixth, Ninth, and Tenth Circuits . . . holding that the Fourth Amendment applies to claims of excessive force used prior to the time of an initial judicial appearance.@ <u>Id.</u> at 1463.  Without any direction to the contrary from the Eleventh Circuit, those decisions might have persuaded the Court to adopt that approach as well.  In the twelve years since the court reached that conclusion in <u>Albritten</u>, however, the Eleventh Circuit spoke on the question, at least to some degree, in <u>Fennell</u>.  As the Court detailed above, the court=s observation in <u>Fennell</u> that the plaintiff was correct to concede that the Fourteenth Amendment applied to his claims cannot be reconciled with the rule that the Fourth Amendment applies prior to the time of an initial judicial appearance.

At some point, when the Eleventh Circuit is forced to address this issue, it may well dismiss

the statement from <u>Fennell</u> and adopt an approach completely contrary to the one <u>Fennell</u> suggests. Until that point, the Court will apply its best interpretation of the Eleventh Circuit=s statement in <u>Fennell</u>.  Given the Court=s understanding of <u>Fennell</u>, the Fourteenth Amendment applies to Howell=s excessive force claims.[10]

> B.     Fourteenth Amendment Due Process Standard

A jailer=s use of force Awill only violate substantive due process rights under the Fourteenth Amendment when it is so egregious that it shocks the conscience.@ <u>Cockrell v. Sparks</u>, 510 F.3d 1307, 1311 (11th Cir. 2007).  AThe use of force does not >shock the conscience= if it is applied >in a good-faith effort to maintain or restore discipline.=  However, if the force is applied >maliciously and sadistically to cause harm,= then it does >shock the conscience,= and is excessive under the Eighth or Fourteenth Amendments. @<u>Fennell</u>, 559 F.3d at 1217 (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 7, 112 S. Ct. 995, 999, (1992)).  The question of whether the use of force was malicious and sadistic is wholly separate from and cannot be answered by reference to a department=s conclusion that an officer=s use of force was excessive and unnecessary under its own policies.  <u>Id.</u>

A[I]n determining whether the force was applied maliciously and sadistically to cause harm,@ courts consider the following factors: Aa) the need for the application of force; b) the relationship between the need and the amount of force that was used; c) the extent of the injury inflicted upon the

---

[10]     Howell also briefly relies on the Court=s earlier Order allowing him to amend his complaint to assert a Fourth Amendment claim in support of his argument that the Fourth Amendment applies here.  In that Order, the Court only decided that given the allegations of the complaint, a Fourth Amendment claim was not futile.  The Court made no ruling at that point as to the ultimate governing constitutional provision.  Having considered the legal question more fully and in light of the facts of the case, the Court now finds that the Fourteenth Amendment

prisoner; d) the extent of the threat to the safety of staff and inmates; and e) any efforts made to temper the severity of a forceful response. Id.  In doing so, courts must give a wide range of deference to prison officials acting to preserve discipline and security, including when considering [d]ecisions made at the scene of a disturbance. Cockrell, 510 F.3d at 1311 (quoting Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990)).

      C.     Use of Force by Officers Who Personally Participated in the Incident

           1.     Use of Tasers by Sergeants King and Reynolds

The undisputed evidence shows that prior to the time the officers moved into the pit area and removed the chairs, Howell had refused several different officers orders to remove his non-regulation shorts.  In doing so, he had cursed at the officers and made at least general threats that he would fight the officers and that force would be required to get him to give up the shorts.  Once the officers moved the chairs, Howell stood up and walked to the center of the circle of officers.  He continued to refuse to comply with orders to take off his shorts.  He began cursing the officers again and making, at the least, general threats to fight the officers.  Accounts from multiple officers and the videotape all show Howell moving within the circle of officers and gesturing with his arms by his sides.  Several officers testified that Howell balled up his fists at times.  Finally, just before Sergeants Reynolds fired her taser, Howell turned and made a movement towards her.  Several officers characterized it as an aggressive move.  Although Corporal Baker testified that Howell did not take an aggressive action toward Reynolds, he does not appear to dispute that Howell turned and took a step toward her before she fired the taser. Sergeant King, seeing Howell move towards Reynolds, fired her taser as well.

           a. Need for Application of Force

---

governs this case.

Howell created a situation which justified the use of some force.  When an inmate creates a disturbance, jailers are justified in using force to restore order.  <u>Cockrell v. Sparks</u>, 510 F.3d 1307, 1311 (11th Cir. 2007) ("The need for the use of force is established by the undisputed evidence that [the inmate] created a disturbance . . . .  Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." (quoting <u>Bennett v. Parker</u>, 898 F.2d 1530, 1533 (11th Cir. 1990)) (alteration omitted)).  At the time Sergeants Reynolds and King fired their tasers, Howell had been creating a disturbance for a period of time.  He had continually refused various officers' commands to remove his non-regulation shorts.  He cursed the officers and threatened that he was going to fight and that the officers would have to use force to remove his shorts.  When the officers surrounded him in a show of force, he stood up and started pacing and gesturing in the middle of the officers.  He continued to make his threatening statements and at times balled up his fists.  Finally, he turned and made a movement toward Reynolds.  Whether the movement was aggressive or not is immaterial.  Likewise, Howell's contention that he never attempted to hit any officer and never raised his fists is also immaterial.  At that point, Howell had created a disturbance that justified the use of force to restore order and force compliance with Detention Center regulations.

### b. Relation Between the Need and Amount of Force Used

The force employed by Sergeants Reynolds and King in firing their tasers was not an unreasonable amount of force under the circumstances. Several officers, including Sergeant Reynolds, were aware that Howell had refused to comply with officers' orders in the past and that officers had been required to use force against him to subdue him during at least one prior incident.  <u>See</u> <u>Skrtich v. Thornton</u>, 280 F.3d 1295, 1301 n.7 (11th Cir. 2002) ("An officer's knowledge of [past

37

confrontations] may be relevant to the assessment of the degree of force that a reasonable officer would have believed was necessary.@  As described above, during the incident Howell had threatened to fight the officers and had told them that force would be necessary to get him to give up his shorts.  Even in the face of nine officers surrounding him, he still refused to comply with the officers= orders.  Finally, just before Sergeants Reynolds and King fired their tasers, Howell turned and took a step, whether aggressive or not, towards Sergeants Reynolds.  Under those circumstances, firing a taser at Howell was a reasonable response.  Cf. Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (holding, in context of Fourth Amendment excessive force claim, that it was not unreasonable for an officer to tase an individual who was Ahostile, belligerent, and uncooperative@ and had Arepeatedly refused to comply with [the officer=s] verbal commands@ while Aus[ing] profanity, mov[ing] around and pac[ing] in agitation, and repeatedly yell[ing] at@ the officer).[11]  Given Howell=s refusal to comply with commands, the use of a taser was a reasonable means of attempting to enforce compliance without precipitating a dangerous physical confrontation.  Cf. Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002) (noting, in context of Fourth Amendment excessive force claim, that A[c]ourts have consistently concluded that using pepper spray is reasonable . . . where the plaintiff was either resisting arrest or refusing police requests@ and that Apepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee@.

c. Extent of the Injury Inflicted

Although the Anature of the force rather than the extent of the injury@ is the key question in an Eighth Amendment or Fourteenth Amendment excessive force case, Wilkins v. Gaddy, 130 S. Ct.

---

[11]     AThe standard for showing excessive force in violation of the Fourteenth Amendment . . . is higher than that required to show excessive force in violation of the Fourth

Case 5:09-cv-00402-CAR   Document 98   Filed 08/26/11   Page 39 of 58


1175, 1176 (2010) (per curiam), the extent of the injury is still a relevant "factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation," id. at 1178. Howell is incapable to testify as to his experience with the taser, but there appears to be no dispute that a stun cycle from a taser is painful and debilitating while it is happening. Nonetheless, under normal circumstances a taser does not inflict any substantial or permanent injury. This case appears to be normal. The probes left two small cuts on Howell's body, but there is no evidence that the use of the tasers resulted in any permanent or substantial injury to Howell. The Supreme Court has made clear that the absence of some threshold quantum of injury is not dispositive of an Eighth or Fourteenth Amendment excess force claim. See id. at 1178–79. Bearing that in mind, the Court still finds that the minor nature of Howell's injuries from the tasers indicates that Sergeants Reynolds and King used their tasers in order to subdue and control Howell and not to maliciously and sadistically harm him.

### d. Extent of the Threat to the Safety of Staff and Inmates

Under the circumstances, the threat Howell posed to the officers was not insubstantial. As discussed above, in previous visits to the Detention Center, Howell had caused disturbances and refused to comply with officers' commands. At least one prior incident required officers to use force to subdue Howell. On the night in question, Howell was once again refusing to comply with commands, threatening to fight officers, and telling officers that force would be required to remove his shorts. Moreover, he continued to do so in the face of nine officers. Under those circumstances, it was reasonable for Sergeants Reynolds and King to believe there was a serious risk physical confrontation, and the corresponding possibility of harm to the officers, if the officers continued to

Amendment." Fennell, 559 F.3d at 1217.

attempt to force Howell to comply with their orders.

### e. Efforts Made to Temper the Severity of a Forceful Response

The officers also made some effort to temper the severity of their response.  After the incident was over, the officers immediately called the nurse to tend to Howell.  See Cockrell, 510 F.3d at 1312 ("[T]he fact that [the officers] immediately summoned medical assistance for Cockrell, 'temper[ed] the severity of [the] forceful response,' and makes it less likely that either of them was acting sadistically instead of in good faith."(quoting Whitley v. Albers, 475 U.S. 312, 320B21 (1986)).

Considering all the factors, the undisputed evidence shows that Sergeants Reynolds and King tased Howell in a good faith effort to restore order and not with a malicious and sadistic intent to harm him.  Howell argues in passing that Sergeant King=s alleged comment to Corporal Baker, "Guess what, Baker, you get to tase Shamel" demonstrates the "malicious and sadistic nature of the attack." The statement, however, does not support that inference.  First, the statement was made at a point when Howell had already refused to remove his shorts and told several officers that force would be necessary in order to get him to remove them.  The statement then acknowledges that use of force C by way of a taser C will likely be necessary.  Nonetheless, Sergeants Reynolds and King did not tase Howell immediately after Sergeant King allegedly made that statement.  Instead, the officers continued to direct Howell to remove his shorts and gave him a chance to comply.  They then surrounded him in a show of force in an attempt to convince him to remove his shorts.  Still, Howell continued to refuse to comply and continued to threaten to fight the officers and to tell them that force would be necessary to get his shorts.  Finally, after Howell continued to pace and gesture in the circle of officers, he took a step toward Reynolds.  At that point, Sergeants Reynolds and King fired their tasers.  Given that the officers gave Howell further opportunities to comply after King allegedly

40

made that statement, and given that Sergeants Reynolds and King did not fire their tasers until Howell appeared to escalate the situation, King's alleged statement is simply not enough to support the inference that the sergeant's decision to tase Howell was a malicious and sadistic attempt to harm him, rather than a good faith response to the situation she faced.[12]

2.      Use of Force by Defendants Taylor, Blair, Graham, Johnson, and Askew in Removing Howell's Jumpsuit

After Sergeants King and Reynolds fired their tasers, Howell fell to the ground.  After the taser cycle ended, he started to draw his left leg forward.  The officers the moved in and went hands on with Howell.  Taking the evidence in the light most favorable to Howell, once the officers moved in, he was not offensively attacking the officers.  Instead, he was either trying to protect himself or passively resisting by twisting his body.  There is no evidence that any of the above named defendants kicked, punched, or stomped Howell during the incident.  Instead they all participated to some degree in the scrum that eventually led to Howell's jumpsuit being torn off and his shorts removed.

Considering the same factors from above, any force applied by these officers was applied in a good faith attempt to restore order, rather than a malicious and sadistic attempt to harm Howell.

---

[12]      Howell also suggests in passing that the use of two tasers changes the analysis. The Court disagrees.  This is not a case where the first officer fired her taser, and then after a clear change in circumstances, the second officer fired her taser.  Here, the undisputed evidence is that both officers faced the same situation, they both sensed the same threat, and they fired their tasers simultaneously in response to that perceived threat.  Thus, they both perceived the same need for force, and they both responded with force that the Court has determined to be constitutionally permissible under the circumstances.

The parties also briefly dispute the physiological effect of the simultaneous tasing. Defendants suggest the use of two tasers at once has the same effect as one.  Disagreeing, Howell points the testimony of his expert witness Andrew Scott that two tasers would deliver a double dose of amperage.  Assuming for now that his testimony is otherwise admissible, Scott then goes on to say that he could not assess whether the use of two tasers simultaneously would be any more painful than one.  Given that, there is no evidence that the use of two tasers had any greater effect on Howell than the use of one.

After Sergeants King and Reynolds tased Howell, he was no longer on his feet and no longer threatening to fight the officers.  Nonetheless, he had maintained up to that point that force would be required to remove his shorts.  Furthermore, once the officers moved in on him, he begin to twist or turn his body.  Thus, the officers still needed to apply some force to achieve their objective of removing his shorts.  The force the above named officers applied in achieving that objective was minimal.  There is no evidence that Howell suffered any injury at the hands of these officers.  And as discussed in the previous section, the officers summoned the nurse to tend to Howell as soon as the incident was over.  In short, the above named officers employed a minimal amount of force that resulted in no injury in order to force Howell into compliance with Detention Center regulations.  All evidence indicates that the officers acted in a good faith attempt to restore order by bringing Howell into compliance with a valid Detention Center regulation.

3.       Use of Force by Defendants Chambers, Baker, and Law

These three defendants faced the same situation described above.  Once Howell was on the ground and the officers moved in on him to remove his jumpsuit and shorts, he was twisting or rolling his body either to protect himself or defensively resist the officers=attempts to remove his jumpsuit.  He was not, however, offensively attacking the officers.  Faced with that situation, the evidence, taken in the light most favorable to Howell, shows that these three officers kicked Howell while he was on the ground.  Indeed, Deputy Chambers admits to losing his cool and kicking Howell.

Considering the relevant factors, the evidence supports submitting to the jury the question of whether these three officers employed force in a good faith attempt to restore order or in a malicious and sadistic attempt to harm Howell.

a. Need for Application of Force

42

As described above, once Howell went to the floor, there was still some need for the use of force because Howell had evinced an intent not to give up his shorts unless force was used and because Howell was still twisting or turning his body, which regardless of his motivation, was preventing the officers from carrying out their objective of removing his clothes.

### b. Relationship Between the Need and the Amount of Force Used

Taking the evidence in the light most favorable to Howell, kicking Howell was not a reasonable response to the situation.  After he was tased, Howell did not aggressively attack or offensively resist the officers.  He no longer made verbal threats.  Instead, he called out for his mother, while twisting or rolling his body to protect against the officers.  At that point, Howell did not present a hostile threat that needed to be subdued.  The use of the tasers greatly reduced any resistance on Howell's part.  Once he was subdued by the tasers, the only objective left for the officers was to remove his shorts.  Given that there were nine officers in close contact with Howell and that he was offering at most minimal resistance to the officers' attempts to remove his jumpsuit and shorts, the alleged kicks to Howell's back were an unnecessary application of force at that point. See Skrtich, 280 F.3d at 1302 (finding evidence of Eighth Amendment violation when officers kicked, punched, and beat an inmate after an electric shock rendered him unable to resist).

### c. Extent of the Injury Suffered

Taken in the light most favorable to Howell, the evidence shows that he suffered bruises or abrasions as a result of the kicks or stomps to his back.  There is no evidence that he suffered any permanent or significant injury as a result of the incident.  The minor nature of Howell's injuries from the alleged kicks certainly weighs against finding that Chambers, Law, and Baker were acting with a malicious and sadistic intent to cause harm.  As discussed, however, the Supreme Court has noted

that the "nature of the force rather than the extent of the injury" is the key question in an Eighth Amendment or Fourteenth Amendment excessive force case. Wilkins, 130 S. Ct. at 1176. If Howell was clearly offering little to no resistance after he was tased, the application of any force that resulted in physical injury was arguably unnecessary. The extent of Howell's injuries will likely limit any damages he might recover. Nonetheless, given the circumstances, Howell's injuries were not so *de minimis* as to defeat his excessive force claim.

### d. Extent of the Threat to the Safety of Staff and Inmates

Taking the facts in the light most favorable to Howell, he did not aggressively resist the officers after he was tased, but instead passively defended or protected himself by twisting or turning his body. Considering that in conjunction with the fact that there were nine officers in close contact with Howell, he posed little danger to any of the officers after he was tased.

### e. Efforts Made to Temper the Severity of a Forceful Response

As discussed above, the officers called the nurse to tend to Howell immediately after the incident.

Considering the analysis above, the Court cannot find as a matter of law that Chambers, Law, and Baker did not violate Howell's Due Process rights under the Fourteenth Amendment. The evidence, taken in the light most favorable to Howell, is sufficient to support the inference that Chambers, Law, and Baker's use of force was a malicious and sadistic attempt to harm Howell, rather than a good faith attempt to restore order.

### 4. Whether Chambers, Law, and Baker Violated Clearly Established Law

Chambers, Law, and Baker argue that even if they violated Howell's Fourteenth Amendment rights, they are entitled to qualified immunity because their actions did not violate clearly established

44

law.  Normally, government actors are entitled to qualified immunity for claims brought against them in their individual capacity unless the plaintiff can demonstrate their actions violated clearly established law.  See Fennell, 559 F.3d at 1216.  That is not the case, however, for excessive force claims brought under the Fourteenth Amendment.  In order to defeat a defendant=s claim of qualified immunity in a case alleging excessive force under the Fourteenth Amendment, the plaintiff need only demonstrate that the defendant=s actions violated the defendant=s Fourteenth Amendment rights.  Id. at 1216B17.  (AFor claims of excessive force in violation of the Eighth or Fourteenth Amendments, however, a plaintiff can overcome a defense of qualified immunity by showing only the first prong, that his Eighth or Fourteenth Amendment rights have been violated.@).  Howell has demonstrated the required constitutional violation.  That is all this is required to defeat Chambers, Law, and Baker=s claim to qualified immunity.

       D.     Liability of Supervisory Officers

Howell contends that the supervisory officers violated his Fourteenth Amendment Due Process rights in two ways.  First, he contends that the supervisory officials were aware of and condoned the operation of the AHardliners@ in the Detention Center.  Second, he contends that a lack of use of force training at the Detention Center demonstrates deliberate indifference on the part of those officials to the constitutional rights of inmates.

Sheriff Talton and Chief Deputy Rape argue that Howell has abandoned any claims against them because he only addresses the roles of Lieutenant Jones and Major Holt in the section of his brief dealing with supervisor liability.  The Court is not required to address potential arguments in opposition to summary judgment not clearly raised by the opposing party.  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (AThere is no burden upon the district court to

distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.@(citation omitted)). In his response brief, Howell never makes any clear argument as to how Chief Deputy Rape or Sheriff Talton violated his constitutional rights. The closest he comes to attributing some objectionable conduct to either is by arguing that use of force training at the Detention Center was nonexistent. He never attributes that lack of training to any actor though. Perhaps he wishes to attribute that lack of training to Sheriff Talton or Deputy Chief Rape, but if so, he never makes any argument as to why that should be the case. It is equally plausible that he seeks to attribute that lack of training to Lieutenant Jones, who was responsible for supervising the deputies on her shift, or Major Holt, who was the Jail Administrator. Because Howell failed to make any clear argument as to why Sheriff Talton or Chief Deputy Rape should be held liable for violating his constitutional rights, the Court deems those claims abandoned.

The Court now turns to the claims against Lieutenant Jones and Major Holt. AIt is well established that liability in " 1983 cases cannot be premised solely upon a theory of respondeat superior.@ Bryant v. Jones, 575 F.3d 1281, 1299 (11th Cir. 2009). AThe standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous.@Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003). A[S]upervisory liability under " 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation.@Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003). The necessary causal connection can be established in several ways: Awhen a history of widespread abuse puts the

responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so@ Awhen a supervisor=s custom or policy . . . result[s] in deliberate indifference to constitutional rights@ or Awhen facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.@ Id. (internal quotation marks omitted).[13]  If a plaintiff intends to establish the liability of a supervisory official based on a history of widespread abuse, he must come forward with evidence of deprivations that were Aobvious, flagrant, rampant, and of continued duration, rather than isolated occurrences.=@ Bryant, 575 F.3d at 1299B1300 (quoting Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)).

Howell argues that Jones and Holt are liable based on their knowledge concerning the Hardliners and the lack of use of force training at the Detention Center.  Thus, Howell does not appear to argue that either of them personally participated in the unconstitutional conduct or directed their subordinates to act unlawfully.  Instead, Howell argues either that Jones and Holt were aware of a history of widespread abuse and failed to correct the problem or that their policies resulted in deliberate indifference to constitutional rights.  Ultimately, neither argument is successful.

Any information that Jones or Holt had concerning the Hardliners or incidents with specific officers does not constitute evidence of deprivations that were Aobvious, flagrant, rampant, and of

---

[13]        In Ashcroft v. Iqbal, the Supreme Court noted that in the context of section 1983 suits Athe term >supervisory liability= is a misnomer@ because Aeach Government official, his or her title notwithstanding, is only liable for his or her own misconduct.@ 129 S. Ct. 1937, 1949 (2009). The Supreme Court=s statement in Iqbal suggests that some of the Eleventh Circuit=s language regarding supervisory liabilityCfor instance, the statement in Gonzalez regarding A[t]he standard by which a supervisor is held liable in her individual capacity for the actions of a subordinateCis perhaps no longer technically accurate.  Nonetheless, the Eleventh Circuit=s actual standards for Asupervisory liability@ appear to only impose liability on a supervisor for his own misconduct. Indeed, the Eleventh Circuit has continued to quote its pre-Iqbal Asupervisory liability@ standards after Iqbal.  See Bryant, 575 F.3d at 1299.

continued duration.@ Id.  The evidence shows two specific prior use of force incidences.  In one, Deputy Law allegedly hit an inmate with a closed fist.  The inmate was not injured, and Deputy Law was not punished.  Lieutenant Jones was present at the time.  During another, Corporal Baker allegedly kicked an inmate, and Deputy Chambers allegedly stepped on the inmate=s neck during a struggle to restrain him.  First, there is no indication that either of these incidents involved an unconstitutional use of force.  Jailers are sometimes called on to use force in the performance of their jobs and will often be justified in doing so.  In order to prevail on his claim, Howell needs to come forward with evidence of Aobvious@ and Aflagrant@ constitutional deprivations.  Based on the evidence in the record, these incidents were neither obvious nor flagrant.  Furthermore, even assuming they were, the history of abuses must be Arampant and of continued duration.@ Two use of force incidents against unruly inmates hardly constitutes Arampant@ deprivations of Acontinued duration.@ Instead, these were Aisolated occurrences,@ and as such are insufficient to impose liability on Holt or Jones.

Any evidence concerning the Hardliners suffers the same problems.  Sergeants Reynolds and King heard Corporal Baker, Deputy Law, or Deputy Chambers use the term several times.  At some time prior to the incident with Howell, Sergeant Reynolds discussed the group with both Jones and King.  She testified, however, that her concern with the group was not with any officer=s use of force in responding to an incident, but in the way they joked or laughed about the incident afterward.  Likewise, Sergeant King testified that her concern was not with any particular use of force by any officer, but instead with the way they talked afterwards.  In short, both sergeants thought that the manner in which the officers were referring to themselves and discussing their work was inappropriate or unprofessional, but neither sergeant had a problem with the force used in any incident.  Hearing those concerns would not have made Jones or Holt aware of any obvious and flagrant constitutional

deprivations that were rampant and of a continued duration.

Howell's deliberate indifference argument based on a lack of training also fails. As a factual matter, Deputies Law, Taylor, and Chambers—whom Howell contends were inadequately trained—all attended jailer school and were all P.O.S.T. trained. Cf. Holmes v. Kucynda, 321 F.3d 1069, 1078 (11th Cir. 2003) (finding that P.O.S.T. training was adequate training on the subject of probable cause and warrantless searches). Also, all of the officers were aware of the Detention Center's Use of Force Policy. More importantly, in order to establish deliberate indifference on the part of any supervisor, Howell must show that the supervisor was aware of "a need to train and/or supervise in a particular area" and "made a deliberate choice not to take any action." Gold v. City of Miami, 151 F.3d 1346, 1351 (11th Cir. 1998). Thus, Howell must demonstrate "a history of widespread prior abuse" that would "put the [supervisors] on notice of the need for improved training or supervision." Id. at 1352 (internal quotation marks omitted).[14] As already discussed, Howell has not come forward with evidence showing any widespread history of instances of unconstitutionally excessive force in the Detention Center that would have alerted any supervisor to the need for more or better training on the subject. Accordingly, Howell cannot establish liability on the part of Lieutenant Jones or Major Holt.[15]

### E.    Official Capacity Claims

Sheriff Talton, Lieutenant Jones, Corporal Baker, and Deputies Chambers and Law all

---

[14]    Gold is a municipal liability case, but by all appearances the deliberate indifference standard for supervisor liability is at least as stringent as the deliberate indifference standard for municipal liability.

[15]    The Court notes that if it were to consider the same claims against Sheriff Talton and Chief Deputy Rape on the merits, it would reach the same result.

contend that they are entitled to immunity under the Eleventh Amendment for section 1983 claims against them in their official capacities.

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

An action "against one of the United States" need not necessarily be brought against the State as named party, but also includes "certain actions against state agents and state instrumentalities." Regents of the Univ. of Ca. v. Doe, 519 U.S. 425, 429, 117 S. Ct. 900, 903 (1997). "[A] suit against a governmental officer in his official capacity is the same as a suit against [the] entity of which [the] officer is an agent." McMillian v. Monroe Cnty., Ala., 520 U.S. 781, 785 n.2, 117 S. Ct. 1736 n.2 (1997) (internal quotation marks omitted; alteration in original).  Sheriff Talton, acting in his official capacity, is an arm of the state.  See Manders v. Lee, 338 F.3d 1304, 1328 (11th Cir. 2003) (en banc) (holding that the sheriff "in his official capacity is an arm of the State, not [the] County, in establishing use-of-force policy at the jail and in training and disciplining his deputies in that regard").  Because Sheriff Talton is an arm of the state when acting in his official capacity, he is entitled to Eleventh Amendment immunity against official capacity claims.  Furthermore, under Georgia law, sheriff's deputies are employees of the sheriff.  See Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1342 n.32 (11th Cir. 2003) (en banc).  Thus, sheriff's deputies are entitled to the same Eleventh Amendment immunity against official capacity claims as the sheriff.  See Carr v. City of Florence, Ala., 916 F.2d 1521, 1527 (11th Cir. 1990) ("holding that Alabama deputy sheriffs are immune from suit in their official capacities under the eleventh amendment to the United States Constitution";

Morgan v. Fulton Cnty. Sheriff's Dep't, No. 1:05-CV-1576, 2007 WL 1810217, at *5 (N.D. Ga. June 21, 2007) ("[W]hen a sheriff is acting as an arm of the state, his deputies are also entitled to Eleventh Amendment immunity from suits for money damages in their official capacities."). Accordingly, all individually named defendants are entitled to Eleventh Amendment immunity for claims against them in their official capacity.[16]

### F.     Claims Against Houston County

"A county is liable under section 1983 only for acts for which [the county] is actually responsible." Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc) (internal quotation marks omitted; alteration in original).  Accordingly, "a county is liable only when the county's 'official policy' causes a constitutional violation." Id.  A plaintiff can establish a county's policy by identifying either "(1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." Id.  In either case, "a plaintiff (1) must show that the local governmental entity, here the county, has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue." Id.

---

[16]     As Howell points out, Defendants Rape, Holt, King, Reynolds, Taylor, Blair, Graham, Johnson, and Askew do not specifically argue they are entitled to Eleventh Amendment immunity.  Although all of those defendants join in the same motion and the same supporting brief as Sheriff Talton, the brief only specifically argues that Sheriff Talton is entitled to Eleventh Amendment immunity.  The brief does, however, state the rule that sheriff's deputies are entitled to the same Eleventh Amendment protection in their official capacities as the sheriff.  [Doc. 77 at 26].  In any event, as explained above, a suit against any of those defendants in their official capacity is in reality a suit against the State.  The State is immune and has asserted that immunity through Sheriff Talton.  Thus, the Court grants summary judgment as to all individually named defendants for claims brought against them in their official capacities.

Howell contends that Houston County is subject to municipal liability because either Houston County or Sheriff Talton, acting as the County=s policymaker, adopted the policies found in the Houston County Standard Operating Procedures and the Houston County Detention Facility Policy and Procedure Manual.  He then argues those policies caused the alleged violation of Howell=s constitutional rights.

Howell=s argument fails.  To establish Houston County=s liability, Howell would have to demonstrate either that the Standard Operating Procedures and the Detention Facility Policy and Procedure Manual were either promulgated by the County or by Sheriff Talton as a policymaker for Houston County.  See Grech, 335 F.3d at 1343 (A[A] local governmental entity . . . is not liable for ' 1983 violations except for those policies and customs for which the county entity has some control and responsibility.@).  Neither is true here.  Houston County is not responsible for any policy governing the operation of the Houston County Sheriff=s Office, nor is it responsible for any policy adopted by Sheriff Talton.

Sheriff Talton is not a policymaker for the county, at least for the purpose of establishing the policies governing the Detention Center.  Instead, he is an arm of the State of Georgia.  In Manders, the Eleventh Circuit took up the question of whether a sheriff is Aan >arm of the State= in establishing force policy at the jail and in training and disciplining his deputies in that regard.@ 338 F.3d at 1319.  After engaging in an exhaustive analysis of Georgia law, the court concluded that Athe sheriff wears a >state hat= when he creates and implements force policy in the jail.@ Id.  Because Sheriff Talton is operating as a state actor in setting and enforcing use of force procedures at the Detention Center, Houston County cannot be held liable for any constitutional violations allegedly caused by those policies.  See Powell v. Barrett, 496 F.3d 1288, 1319 (11th Cir. 2007) (AOur decision today that

[the]Sheriff acts as an arm of the State forecloses Plaintiffs= argument that the County can be held

liable under " 1983 based on its control of the strip search policies at the Jail. As we previously

explained, the Sheriffs do not act as policymakers for the County when performing their function of

maintaining security at the Jail.@, rev=d on other grounds by 541 F.3d 1298 (11th Cir. 2008) (en

banc).

Even if Houston County cannot be held responsible for the policies adopted by Sheriff Talton

because he is a state actor, Howell argues there is still a jury question as to whether the policies in

question were Sheriff Talton=s policies or the County=s policies.  Howell points to statements made by

Talton during his deposition that he was familiar with and approved the policies and argues that those

statements support the inference that the policies were promulgated by Houston County.  Sheriff

Talton=s statements, however, support no such inference.  Sheriff Talton never indicated that Houston

County was responsible for creating those policies.  Moreover, Georgia law dictates that it could

never be the case Detention Center=s Standard Operating Procedures and Policy and Procedure

Manual were promulgated by the County and simply approved by Sheriff Talton.  The Sheriff=s Office

Ais a separate and independent office from both [the] County and its governing body. . . .  Indeed,

Georgia=s Constitution precludes [the] County from having any control over the sheriff=s office.@

Manders, 338 F.3d at 1319.  Ultimately, there is no evidence that Houston County created and

promulgated these policies that would govern sheriff=s deputies at the Detention Center, nor by all

appearances would it have been legally permissible for it to do so.

G.    Claims Against Houston County Sheriff=s Department

Howell=s claims against the Houston County Sheriff=s Department must be dismissed because

the Sheriff=s Department is not an entity which is capable of being sued.  If a purported party is

neither an individual nor a corporation, then its capacity to be sued is determined "by the law of the state where the court is located." Fed. R. Civ. P. 17(b)(3).  The State of Georgia recognizes three legal entities capable of being sued: "(1) natural persons; (2) an artificial person (a corporation); and (3) such quasi-artificial persons as the law recognizes as being capable to sue." Georgia Insurers Insolvency Pool v. Elbert Cnty., 258 Ga. 317, 318 (1988).  The Court can find no Georgia law authority holding that a sheriff's department is a corporation or a quasi-artificial capable of being sued.  Thus, the Court concludes that the Houston County Sheriff's Department is not capable of being sued and must be dismissed.  See Dean v. Barber, 951 F.2d 1210, 1214 (11th Cir. 1992) ("Sheriff's departments and police departments are not usually considered legal entities subject to suit.").

> H.      State Law Claims

Sheriff Talton, Major Holt, Deputy Chief Rape, Sergeant King, Sergeant Reynolds, Corporal Blair, Deputies Taylor, Deputy Graham, Deputy Johnson, and Deputy Askew all request that the Court not exercise its supplemental jurisdiction over Howell's state law claims against them.  Because the Court has not dismissed all claims over which it has original jurisdiction, the Court will continue to exercise supplemental jurisdiction over the state law claims.  See 28 U.S.C. ▪ 1367(c).  In doing so, the Court will apply the arguments made by Lieutenant Jones, Corporal Baker, Deputy Law, and Deputy Chambers regarding immunity under state law to the state law claims against the other defendants as well.  As Howell points out, the other defendants advanced no argument along that front.  Nonetheless, Howell clearly had the chance to respond to arguments on the matter in responding to the summary judgment motion filed by Jones, Baker, Law, and Chambers.  The immunity arguments apply in the same fashion to all defendants; thus, in the interest of judicial

economy the Court will apply the immunity arguments to all defendants.

1. Sovereign Immunity for Official Capacity Claims

ASovereign, or governmental, immunity protects governmental bodies from legal action.@ Banks v. Happoldt, 271 Ga. App. 146, 146 (Ga. App. 2004).  The immunity extends to public employees sued in their official capacities.  Id.  Howell has not come forward with any evidence or authority to establish that the State has waived its sovereign immunity for the claims he raises in this suit.  See id. at 148 (ASovereign immunity is not an affirmative defense that must be established by the party seeking its protection. Instead, immunity from suit is a privilege and the waiver must be established by the party seeking to benefit from the waiver.@(internal quotation marks omitted)).  Accordingly, the Court finds that all individually named defendants are entitled to sovereign immunity for any state law claims raised against them in their official capacities.

2. Official Immunity for Individual Capacity Claims

The State of Georgia also recognizes a second, more limited immunity for claims brought against public employees in their individual capacities.

> Qualified immunity protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption. Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure.

Id. (internal quotation marks omitted).  Georgia courts have explained the difference between ministerial and discretionary acts as follows:

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed. Procedures or instructions

55

> adequate to cause an act to become merely ministerial must be so clear, definite and
> certain as merely to require the execution of a relatively simple, specific duty.

Id. at 149 (internal quotation marks omitted).

Howell contends that the actions taken by the officers in this case were ministerial acts.  He
has failed, however, to point to any instructions that any officers were operating under that were so
"clear, definite and certain as merely to require the execution of a relatively simple, specific duty."
Id.  Indeed, officers will normally be required to exercise their judgment by "examining the facts,
reaching reasoned conclusions, and acting on them in a way not specifically directed" in use of force
situations.  Id.  Under normal circumstances, a use of force policy will require officers to use their
discretion to assess both the risk an individual presents and the reasonable force necessary to address
the situation.  Howell has failed to come forward with any evidence indicating that this case falls
outside of normal circumstances.  Accordingly, the Court finds that the officers were performing
discretionary acts.

Because the officers were performing discretionary acts, Howell must show that the officers
were acting with malice or an intent to injure in order to defeat their claims of qualified immunity.
The outcome under that standard follows naturally from the Court's analysis of Howell's section
1983 claims.  There, the Court found that there was a question of fact for the jury as to whether
Corporal Baker, Deputy Law, and Deputy Chambers kicked Howell in a malicious and sadistic
attempt to cause him harm.  That being the case, there is likewise a jury question as to whether they
acted with the required malice or intent to injure in order to defeat their claims to qualified immunity
against the state law claims.  Accordingly, Baker, Law, and Chambers are not entitled to qualified
immunity under state law.  There is no evidence that any other defendant acted with malice or an

intent to injure Howell.  As a result, all other individually named defendants are entitled to qualified immunity under state law for Howell=s claims against them in their individual capacities.

> I.      Punitive Damages Against Baker, Law, and Chambers

Howell claims that he is entitled to punitive damages under O.C.G.A. ▪ 51-12-5.1.  That code section provides that A[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant=s actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.@ O.C.G.A. ▪ 51-12-5.1(b).  As to Baker, Law, and Chambers, the Court has found that there is an issue of fact as to whether those defendants acted with the malice or wantonness that would establish a conscious indifference to consequences.  Thus, Howell may pursue a claim for punitive damages against those defendants.  All other defendants are entitled to summary judgment on Howell=s claims seeking punitive damages under O.C.G.A. ▪ 51-12-5.1.[17]

## IV. CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment filed by Defendants Jones, Baker, Law, and Chambers [Doc. 76], is **GRANTED-IN-PART** and **DENIED-IN-PART**.  The Court **GRANTS** summary judgment in favor of Defendant Jones on all claims against her, in both her individual and official capacities.  The Court **GRANTS** summary judgment in favor of Defendants Baker, Law, and Chambers on both the federal and state law claims brought against them in their official capacities.  The Court **DENIES** summary judgment on Howell=s Fourteenth

---

[17]      The Court notes that the parties have not addressed Howell=s entitlement to punitive damages for his section 1983 claims.

Amendment claims brought under section 1983 against Baker, Law, and Chambers in their individual capacities.  Likewise, the Court **DENIES** summary judgment on Howell=s state law claims brought against Baker, Law, and Howell in their individual capacities.  The Court also **DENIES** summary judgment on Howell=s claim for punitive damages against Baker, Law, and Chambers.  In short, Howell may pursue his Fourteenth Amendments claims and state law claims, including for punitive damages, against Baker, Law, and Chambers in their individual capacities.

The Motion for Summary Judgment filed by the remaining defendants [Doc. 77] is **GRANTED**.

SO ORDERED this 26th day of August, 2011.

S/  C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

bcw